J. D. PAVLAK, LTD., Plaintiff-Appellant, *v.* WILLIAM DAVIES CO., INC., Defendant-Appellee.

First District (3rd Division)     No. 62861

Opinion filed June 17, 1976.

William S. Kaplan and Robert Marks, both of Chicago, for appellant.

Alfred E. Williston and Robert O. Kuehn, both of Chicago, for appellee.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

J. D. Pavlak, Ltd., a purveyor of meats, sued William Davies Co., for breach of contract and asked for $80,000 in damages. Davies admitted that it owed Pavlak $8,128.24. Both parties moved for summary judgment with Pavlak asking that damages be fixed at $61,208.19 and Davies that they be fixed at $8,128.24. The trial court granted Davies' motion and entered judgment in favor of Pavlak for $8,128.24. The principal issue in Pavlak's appeal is the trial court's construction of a contractual provision pertaining to the settlement of disputes.

Pavlak purchases and resells frozen carcasses and boneless meats to processors, manufacturers and other meat traders like itself. Davies is similarly engaged. As a result of telephone conversations between them in November 1973, Pavlak agreed to buy and Davies agreed to sell a large quantity of Australian beef which would not have a fat content in excess of 15%. Similar negotiations were conducted in January 1974. Soon after the telephone transactions, the parties exchanged purchase orders and sale confirmations. Pavlak then resold its November purchase to a meat trader, York International Exchange, and resold its January purchase to a food processor, Jeno's Inc. Pavlak entered into contracts with the repurchasers in which it promised that the meat bought by them would have a fat content of 15% or less, but after delivery it was discovered that the fat content exceeded 15%. York rejected the shipment and demanded repayment of the purchase price plus handling costs, a total of $104,703.99. Pavlak consented to the cancellation and resold the meat to another party for $67,276.80, suffering a loss of $37,427.19. Jeno's entered into a settlement with Pavlak whereby it kept the meat and was paid $23,781.00 by Pavlak.

As a result of these transactions Pavlak lost $61,208.19 ($37,427.19 + $23,781.00) plus legal and other costs, and sought reimbursement from Davies. Davies offered Pavlak $8,128.24—a figure computed under a settlement formula contained in the sales confirmations. Pavlak refused to accept this sum and Davies refused to increase it. The stalemate prompted this litigation.

The part of the contract that is the core of the controversy is as follows:

"This confirmation is binding unless buyer notifies seller in writing, within ten days of receipt, of any discrepancies or objections.

This transaction covers imported meat that is represented as 90% Lean by visual estimation which is the equivalent of 85% Lean by chemical analysis.

If the produce tests less than 85% Lean by chemical analysis, seller will allow for excess fat content at invoice price and buyer will accept such as full settlement."

There is no argument that the figure $8,128.24 represents the amount due under the sales confirmation formula. The dispute is whether Davies owes a larger sum in view of the provisions of article 2 of the Uniform Commercial Code (Ill. Rev. Stat. 1975, ch. 26, par. 2—101, *et seq.*).

A buyer who has accepted goods and given proper notice may recover damages for breach of contract. (Uniform Commercial Code, section 2—714(1).) Both incidental and consequential damages are obtainable in a proper case. (Section 2—714(3).) These damages are subject to contractual limitation. Section 2—718(1) of the Code allows for the liquidation of damages obtainable in the event of a contract breach. Section 2—719(1)(a) states that the parties may contract to "provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article * * *." Section 2—719(1)(b) states that a remedy noted in the contract "is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy."

■■ Pavlak and Davies agree that the contractual provision that the "seller will allow for excess fat content at invoice price and buyer will accept such as full settlement" is a remedy such as contemplated in section 2—719(1)(a). A preliminary question is whether the remedy "is expressly agreed to be exclusive, in which case it is the sole remedy." (Section 2—719(1)(b).) A remedy will be held to be exclusive when that is the reasonable construction of the contract despite any failure to employ the word "exclusive." (*Dow Corning Corp. v. Capitol Aviation, Inc.* (7th Cir. 1969), 411 F.2d 622; R. Anderson, 2 Uniform Commercial Code §2—719:6 (2d ed. 1971).) Any construction that the remedy provided by the sales confirmation was nonexclusive would have rendered meaningless the words that the "buyer will accept such [the amount paid under the settlement formula] as full settlement." The conclusion that the remedy was intended to be exclusive is reinforced by examining the prior dealings between the parties. (See section 2—202(a).) Prior to the November 1973 purchase Pavlak had entered into 50 separate written agreements for the purchase of meat from Davies. The contracts ran back to December 1971 and were for a low of 7,120 pounds to a high of 216,000 pounds. Each of

the sales confirmations contained the condition that "If the product tests less than 85% Lean by chemical analysis, seller will allow for excess fat content at invoice price and buyer will accept such as full settlement." In February 1972 the parties entered into a meat contract for 109,020 pounds, but upon delivery they discovered that the fat content exceeded 15%. Pavlak received $1,640.75 from Davies under the sales confirmation formula and accepted this sum as full and final settlement of its claim. No assertion was made by Pavlak until now that there were further remedies that it could pursue. The obvious conclusion in light of the contract language and these past dealings is that the parties intended the settlement formula to be the exclusive remedy.

■■ ■ One limitation upon the rights of a buyer and seller to contractually modify remedies is indicated by section 2—719(2) of the Code: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." This does not mean that an exclusive remedy has failed "of its essential purpose" whenever a contracting party loses money because a limited remedy provision prevents him from being fully reimbursed for the damages caused by the other party's breach. In *V-M Corp. v. Bernard Distributing Co.* (7th Cir. 1971), 447 F.2d 864, the court, in upholding a limitations provision in a contract, said:

> "Section 2—719 was intended to encourage and facilitate consensual allocations of risks associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved. Even where the defects of the goods cause substantial difficulties to those involved in wholesale and retail distribution, Section 2—719(2) need not automatically require disregard of the particular limitations upon liability specified by the contracting parties."

Pavlak and Davies voluntarily chose to distribute the risks in a manner represented by the sales confirmation formula. We see nothing in this record that would justify altering the contractual allocation adopted by the parties.

■■ Another restriction upon the contractual limitation of remedies is specified in section 2—719(3) of the Code: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." In turn, whether a contract or a provision thereof is unconscionable is determined according to the circumstances existing at the time of the contract's formation. (Section 2—302(1).) One factor to be considered in determining the unconscionability of a limitations provision is whether it was adopted by two experienced parties who dealt with substantially equal strength. Another is whether the provisions's operation involves unfair surprise. *Pick Fisheries v. Burns Electronic Security*

*Services, Inc.* (1976), 35 Ill. App. 3d 467, 342 N.E.2d 105; *Boone Valley Cooperative Processing Association v. French Oil Mill Machinery Co.* (N.D. Iowa 1974), 383 F. Supp. 606; R. Anderson, 2 Uniform Commercial Code §2—719:27 (Supp. 1975). Both Pavlak and Davies are seasoned, professional traders. There was no disparity in their position or capacity. They had dealt with each other at least 50 times before entering into the November 1973 and the January 1974 contracts and, as mentioned, they had once before entered into a settlement under the sales confirmation formula. Any conclusion that these contracts are unconscionable would be unwarranted. In short, the settlement formula was a valid limitation of remedies clause under section 2—719.

■■ Pavlak also argues that the limitation of remedies provided in the contracts would not preclude it from recovering damages for a breach of any warranty, express or implied, that may have arisen. Certain warranties may attach when goods are sold: express (Uniform Commercial Code, section 2—313), implied warranty of merchantability (section 2—314), and implied warranty of fitness for a particular purpose (section 2—315). A buyer who has accepted the goods and given proper notice may recover damages for breach of warranty. (Section 2—714(1), (2).) This remedy may be excluded or modified under sections 2—718 and 2—719. (Section 2—316(4).) One court has held that a remedies limitation is ineffective against the breach of a warranty of merchantability unless the term "merchantability" is expressly mentioned in the limitations clause. (*Zicari v. Joseph Harris Co.* (1969), 33 App. Div. 2d 17, 304 N.Y.S.2d 918.) This holding has been carefully and persuasively criticized. (*Orrox Corp. v. Rexnord, Inc.* (N.D. Ala. 1975), 389 F. Supp. 441.) In any event, the *Zicari* holding was not based upon a factual situation where, as here, both the contractual terms and the parties' prior dealings indicate that no implied warranty of merchantability was intended. The sales confirmations implicitly indicated that the meat delivered might have a fat content in excess of 15%. It was because of this possibility that a settlement formula was provided whereby the seller would "allow for excess fat content at invoice price * * *." In the face of this language it is wholly unrealistic to contend that the buyer ever impliedly (or expressly) warranted that the meat delivered would always be at least 85% lean. This is particularly true in view of the previous settlement entered into by the parties under the settlement formula where the meat delivered was not 85% lean. As noted, Pavlak never complained that the excess fat content breached any warranty attached to the sale. We conclude that the contract language plus the parties' previous relations were more than adequate to exclude any implied warranty that the meat would not have a fat content of more than 15% by chemical analysis. Section 2—316(3)(a), (c).

Pavlak's final point is that it is entitled to recover damages for its losses under common law principles. None of the cases cited are even remotely on point. Some involve false representation and deceit in the formation of a contract. (See *e.g., Chanin v. Chevrolet Motor Co.* (7th Cir. 1937), 89 F.2d 889.) Others involve indemnification by a third party when that party was negligent. (See, *e.g., Ferro v. United States* (N.D. Ill. 1955), 181 F. Supp. 767.) There was no proof that Davies acted either fraudulently or negligently. The judgment is affirmed.

Judgment affirmed.

MEJDA, P. J., and McNAMARA, J., concur.